# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA CHMIL and TERRENCE E. CHMIL, | |
| Plaintiffs, | NO. 3:18-CV-01616 |
| v. | (JUDGE CAPUTO) |
| ARTHREX, INC., | |
| Defendant. | |

## **MEMORANDUM**

Presently before me is a Motion to Dismiss (Doc. 22) filed by Defendant Arthrex, Inc. Plaintiffs Lisa and Terrence Chmil allege that Arthrex's iBalance device, which was surgically implanted in Lisa Chmil's knee twice by Dr. Thomas Meade, was defective and caused them injuries. (*See* Doc. 19). The Chmils also allege that Arthrex and its purported agent Dr. Meade made intentional and negligent misrepresentations regarding the iBalance device. (*Id.*). Arthrex moves to dismiss the Chmils' complaint on the grounds that the statute of limitations has run out and that the Chmils fail to state claims upon which relief may be granted. (*See* Doc. 23). But Arthrex's statute of limitations defense is premature, as the Chmils plead facts suggesting they have timely filed their complaint. Additionally, the Chmils have adequately pled all their challenged claims. The Motion will be therefore be denied.

## I. Background

According to the complaint, on May 21, 2015, Lisa Chmil ("Lisa") underwent a "total left knee replacement." (Doc. 19 at ¶ 9). Dr. Thomas Meade performed the surgery, during which he replaced Lisa's knee with an Arthrex iBalance knee system. (*Id.*). Dr. Meade, incidentally, was paid "more than $250,000" by Arthrex for his designing, testing, consulting, promotional, and other work on the iBalance device. (*Id.* ¶¶ 19-21).

Around May or June of 2016, Lisa returned to Dr. Meade because she was suffering "severe pain, swelling and discomfort" following her initial surgery. (*Id.* ¶¶ 10, 12). As it turns out, Arthrex had "issued a recall of the Arthrex iBalance TKA Tibial Tray" in February of

2016, which included the iBalance device Dr. Meade implanted. (*Id.* ¶ 11). But when Dr. Meade saw Lisa after her pain complaints, he represented to her "that none of the parts utilized in her initial knee implant surgery were subject to the recall," even though he knew or should have known that was false. (*Id.* ¶¶ 13, 45, 63). Instead, Dr. Meade operated on Lisa a second time, implanting a second iBalance device which again resulted in excessive post-surgical discomfort. (*Id.* ¶¶ 15-16). And throughout this period in time, Arthrex "disseminated to health care professionals and consumers—through published labels, marketing materials, direct communications, and otherwise—information that misrepresented the efficacy and longevity of [iBalance] with the intention that health care professionals and consumers would rely upon that information." (*Id.* at ¶ 52). Among other things, Arthrex stated that iBalance "had been tested and found to be safe and effective," even though Arthrex knew that statement was false. (*Id.* ¶¶ 56, 61). These statements "were made directly by [Arthrex], its sales representatives, and other authorized agents, and in publications and other written materials directed to health care professionals, medical patients, and the public." (*Id.* ¶ 58)

In June of 2017, still experiencing pain, Lisa sought the advice of a different surgeon, Dr. Mathias Bostrom. (*Id.* ¶ 16). Dr. Bostrom removed the second iBalance device in a September 21, 2017 surgery, after the device failed. (*Id.* ¶ 17). Later, on June 27, 2018, Dr. Bostrom revealed to Lisa "that the second Arthrex iBalance device failed due to loosening of the tibial tray." (*Id.* ¶ 18). These iBalance devices failed, the Chmils allege, because Arthrex "failed to exercise due care" in designing, manufacturing, marketing, testing, promoting, and fixing iBalance. (*See id.* ¶ 37). Arthrex also negligently failed to warn doctors of iBalance's faults, and continued to promote iBalance despite knowing it was a defective product. (*Id.*).

Accordingly, Lisa and her husband Terrence filed suit on August 16, 2018. (*See* Doc. 1). On November 7, 2018, the Chmils filed their amended complaint (Doc. 19) by the parties' stipulation (Doc. 18). In their complaint, the Chmils bring four causes of action against Arthrex: negligence, intentional misrepresentation, negligent misrepresentation, and

loss of consortium. (*See generally* Doc. 19). In addition to compensatory damages, the Chmils seek punitive damages for Arthrex's "wanton, willful, fraudulent, [and] reckless acts." (*Id.* at 16-17 (styling their prayer for punitive damages as a fifth "cause of action")). Arthrex filed the instant Motion to Dismiss on November 30, 2018, (Doc. 22) and argues that all of the Chmils' claims should be dismissed for (1) failing to file them within the two-year statute of limitations; and (2) failing to adequately plead their claims. (*See generally* Docs. 23, 27). The Chmils filed their brief in opposition (Doc. 26), to which Arthrex filed its reply (Doc. 27).

The Motion has thus been fully briefed and is now ripe for review.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. The defendant, as the movant, bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000). When considering a Rule 12(b)(6) motion, my role is limited to determining if a plaintiff is entitled to offer evidence in support of her claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). A court does not consider whether a plaintiff will ultimately prevail. *Id*.

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The statement required by Rule 8(a)(2) must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). Detailed factual allegations are not required. *Id.* However, "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Instead, a complaint must "show" this entitlement by alleging sufficient facts to support its claims for relief. *Id.*; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1)

3

identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (Alito, J.). But I may consider a "document integral to or explicitly relied upon in the complaint." *Id.* (quotation and emphasis omitted). I need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quotation omitted).

### III. Discussion

**A.     Statute of Limitations**

All of the Chmils' claims should be dismissed, Arthrex argues, because the two-year statute of limitations ran out by the time they filed suit in November 2018. (Doc. 23 at 12-22). After all, Lisa's first corrective surgery was on June 6, 2016, which Arthrex contends is the latest point in time Lisa should have realized she was injured by the iBalance device. (*See id.*). The Chmils respond that: (1) under the "discovery rule," the statute of limitations

did not start running until some time between June of 2017 and June 27, 2018—respectively, when Lisa first saw Dr. Bostrom and when Dr. Bostrom informed her that the second iBalance device failed (Doc. 26 at 3-4); (2) fraudulent concealment on the part of Arthrex and Dr. Meade prevent Arthrex from raising a statute of limitations defense (*id.* at 4-5); and (3) the statute of limitations should be equitably tolled (*id.*).

"The discovery rule applies to toll the statute of limitations in any case in which a party is reasonably unaware of his or her injury at the time his or her cause of action accrued." *Gleason v. Borough of Moosic*, 15 A.3d 479, 485 (Pa. 2011). "The *sine qua non* . . . is the determination whether, during the limitations period, the plaintiff was able, through the exercise of reasonable diligence, to know that he or she had been injured and by what cause." *Id.* Specifically, "three independent phases of knowledge must be known or knowable to plaintiff before the limitations period commences: (1) knowledge of the *injury*; (2) knowledge of the *operative cause* of the injury; and (3) knowledge of the *causative relationship* between the injury and the operative conduct." *Berardi v. Johns-Manville Corp.*, 482 A.2d 1067, 1070 (Pa. Super. Ct. 1984) (citation omitted). "[T]he party asserting application of the discovery rule bears the burden of proof," but whether the discovery rule applies is ordinarily a question for the jury to decide. *Gleason*, 15 A.3d at 485.

In *Gleason*, the plaintiffs filed suit in 2001 after suffering injuries from flooding caused by the defendants' negligent road and sewer construction. *See id.* at 482, 486. The flooding began in 1993, and the plaintiffs' illnesses started in 1997 during a "basement renovation that revealed moldy sheetrock, water stains[,] and discoloration on insulation, carpets, and building studs." *Id.* Although the plaintiffs saw doctors for their illnesses between 1997 and 2000, none of the doctors mentioned that the plaintiffs' illnesses could have been mold-related. *Id.* at 484, 486. In remanding for trial, the Pennsylvania Supreme Court held that these facts were not "so clear that reasonable minds" could not differ as to when the statute of limitations began to run: it could have been triggered either in 1997 when mold was uncovered during renovations, or after 2000 when the plaintiffs suspected their illnesses were toxic-mold-related after watching a TV documentary. *See id.* at 485-88.

5

The facts are similar here. The Chmils plead and argue that while they knew Lisa's knee surgeries were not working out, they could not, exercising reasonable diligence, have discovered why until Dr. Bostrom explained iBalance was the culprit. (Doc. 26 at 4; Doc. 19 at ¶ 18). This is sufficient to withstand a motion to dismiss. Like in *Gleason*, where doctors did not mention mold as a cause of the plaintiffs' injuries, Dr. Meade did not mention (and in fact denied) that iBalance was the cause of Lisa's injuries. The Chmils, therefore, may not have had reason to suspect iBalance until another doctor identified it as the cause, just as the plaintiffs in *Gleason* may not have had reason to suspect mold until they watched a documentary that contradicted their doctors' opinions. Whether this amounts to reasonable diligence is, as *Gleason* instructs, a question for the fact-finder to resolve.

Because the Chmils plead facts that indicate the statute of limitations did not begin to run until 2017 or 2018, and because it is not yet so clear that reasonable minds could not differ as to whether they should have discovered the cause of their injuries sooner, Arthrex's Motion to Dismiss will be denied.

**B.   Negligence**

Arthrex next argues that the Chmils' negligence claims are federally preempted. (Doc. 23 at 23-28). In doing so, Arthrex raises matters extraneous to the pleadings—namely, the assertion that Arthrex "was cleared by the [Food and Drug Administration,] pursuant to a 510(k) clearance, to market [iBalance] as designed and manufactured and its marketing was regulated by the FDA." (*Id.* at 24). Arthrex has not found an explicit "hook" in the complaint to hang this assertion on, nor can I find one. There is also no basis for taking judicial notice of Arthrex's assertion, even if Arthrex had attached confirming materials to its motion papers. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 740 n.31 (E.D. Pa. 2011). Moreover, "[p]reemption is an affirmative defense." *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 852 F.3d 268, 271 (3d Cir. 2017). Arthrex, as the defendant, bears the burden of proving that defense, so resolving it at the motion to dismiss stage is improper (except in limited circumstances not present here). *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018) (a preemption

defense must be "apparent on the face of the complaint and documents relied on in the complaint" for a defendant to prevail at the motion to dismiss stage (quotation and quotation marks omitted)). Accordingly, at this time, I cannot decide whether the Chmils' negligence claims are federally preempted.

Athrex's fallback argument is that the Chmils fail to properly allege negligence. (Doc. 23 at 28). Arthrex contends that because Dr. Meade is a "learned intermediary," only he owed a duty to warn the Chmils about iBalance. (*See id.*). The Chmils respond that they allege more than just negligent failure to warn—they allege negligent manufacture, for instance. (Doc. 26 at 9). And to the extent the learned intermediary doctrine comes into play, the Chmils argue the allegation that Arthrex failed to warn Dr. Meade about iBalance suffices to state a claim for negligent failure to warn. (*Id.* at 10).

I agree with the Chmils. They clearly allege more than just negligent failure to warn, (*see* Doc. 19 at ¶¶ 15, 37), which is the only negligence claim Arthrex challenges. Moreover, the learned intermediary doctrine does not shield a medical device manufacture from a negligent failure to warn claim where the warning provided to that intermediary is inadequate. *See Parkinson v. Guidant Corp.*, 315 F. Supp. 2d 741, 748-49 (W.D. Pa. 2004) (applying Pennsylvania law). The Chmils allege the warning Arthrex provided Dr. Meade was inadequate, (*see* Doc. 19 at ¶ 37(f)), so they have stated a claim despite the learned intermediary doctrine.

Arthrex's Motion to Dismiss will therefore be denied as to the Chmils' negligence claims.[1]

---

[1] Arthrex also argues the allegation it was "otherwise careless, reckless and negligent" should be stricken because it is "vague and ambiguous" and "permits Plaintiffs to choose from an unlimited number of yet unspecified damages and/or injuries." (Doc. 23 at 29). "Motions to strike are highly disfavored," though, *Eisai Co. v. Teva Pharm. USA, Inc.*, 629 F. Supp. 2d 416, 424 (D.N.J. 2009), and the movant cannot surmount that disfavor where it fails to explain how the material sought to be stricken is "redundant, immaterial, impertinent, or scandalous," *Bolyard v. Wallenpaupack Lake Estates, Inc.*, No. CIV.A.3:10-CV-87, 2010 WL 1978802, at *2 n.1 (M.D. Pa.

**C.     Intentional Misrepresentation**

The Chmils allege that Arthrex is liable both for its own intentional misrepresentations of material fact and for Dr. Meade's. (Doc. 19 at ¶¶ 42-49). Arthrex moves to dismiss the Chmils' claim on the grounds that there are no factual allegations to suggest Dr. Meade was an agent of Arthrex, and that the allegations of intentional misrepresentation are not specific enough to satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. (Doc. 23 at 29-32).

To state a claim for intentional misrepresentation, a plaintiff must plead, with particularity, "(1) [a] representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (citation omitted). Rule 9(b)'s particularity requirement is satisfied if the plaintiff pleads the "circumstances" of the alleged fraud. *See* Fed. R. Civ. P. 9(b); *Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 86 (3d Cir. 2015). A plaintiff "also must allege who made [the] misrepresentation to whom and the general content of the misrepresentation." *Travelers Indem. Co.*, 620 F. App'x at 86 (quotation omitted). Finally, as for agency, all Pennsylvania law requires is that a plaintiff "identify the agent by name" and "set forth the agent's authority, and how the tortious acts of the agent . . . fall within the scope of that authority." *Ettinger v. Triangle-Pacific Corp.*, 799 A.2d 95, 109 (Pa. Super. Ct. 2002) (quotation omitted).

Here, the Chmils have adequately alleged both Dr. Meade's agency relationship with Arthrex and Dr. Meade's intentional misrepresentation. The Chmils allege that Dr. Meade "was the lead surgeon consultant-designer for the Arthrex iBalance knee system," and that Arthrex paid him "more than $250,000 in royalties and other payments" for his consulting and promoting efforts. (Doc. 19 at ¶¶ 19-21). The Chmils further allege that Dr. Meade told

---

May 14, 2010). That is the case here, so I decline to strike the allegation.

Lisa before her June 6, 2016 corrective surgery that her iBalance device was safe, effective, and not subject to the recall, even though he knew that was all false; Dr. Meade did so intending Lisa to rely on his lie, and she justifiably relied on it to her detriment. (*See id.* ¶¶ 13, 21, 46-47). Accepting the facts as true, Arthrex hired Dr. Meade to promote the iBalance system. Dr. Meade's lie, which induced Lisa to have another iBalance device implanted, therefore fell within the scope of his agency because it promoted the iBalance system. And the facts pled do plausibly suggest that Dr. Meade intentionally misrepresented material fact—he lied to his patient about iBalance's safety before her corrective surgery; he intended that she rely on his misrepresentation; and she justifiably relied on that misrepresentation to her detriment by agreeing to have another defective iBalance device implanted. *Cf., e.g.*, *Carson v. Atrium Med. Corp.*, 191 F. Supp. 3d 473, 479 (W.D. Pa. 2016) (allegations that the defendant "marketed the product as 'safe, fit and effective for use in hernia repair'" when in fact it was not, and that the defendant intended that the plaintiff rely (and that the plaintiff did in fact rely) on that misrepresentation, were sufficiently particular to state a negligent misrepresentation claim[2]); *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2014 WL 7365872, at *6-8 (N.D. Ill. Dec. 23, 2014) (plaintiffs adequately pled fraud where they alleged particular defendants, on particular occasions, "knowingly, falsely, deceptively, and inaccurately" represented that a low testosterone disease existed which their products could remedy).

Arthrex's own intentional misrepresentations have also been sufficiently pled. The Chmils allege that Arthrex "disseminated to health care professionals and consumers—through published labels, marketing materials, direct communications, and otherwise—information that misrepresented the efficacy and longevity of [iBalance] with the intention that health care professionals and consumers would rely upon that information."

---

[2] Negligent misrepresentation claims that "sound in fraud," like that in *Carson*, must also be pled in accordance with Federal Rule of Civil Procedure 9(b). *Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 86 n.3 (3d Cir. 2015).

9

(Doc. 19 at ¶ 52). Arthrex stated, for instance, that iBalance "had been tested and found to be safe and effective," even though Arthrex knew that statement was false. (*Id.* ¶¶ 56, 61). This statement and others "were made directly by [Arthrex], its sales representatives, and other authorized agents, and in publications and other written materials directed to health care professionals, medical patients, and the public." (*Id.* ¶ 58). True, there are no allegations pinpointing when exactly Lisa or Dr. Meade saw Arthrex's untruthful publications; nor does the complaint single out which specific Arthrex employee authored those publications. But Rule 9(b) does not require that level of specificity. *See In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 2014 WL7365872, at *7 ("[Plaintiffs] do not need to state the precise date on which they saw or read an advertisement to adequately plead fraud."). It is enough that the Chmils allege the dates on which Lisa had her iBalance devices implanted, because it would have been around that time she or Dr. Meade relied on Arthrex's publications. *See id.* ("Plaintiffs . . . allege that they and their physicians heard or saw advertisements on the television or Internet some time before they were prescribed the drug. It would be unnecessarily burdensome to require the plaintiffs to identify, for pleading purposes, the exact date on which they heard or saw a particular representation."). And the allegation pointing a finger at Arthrex and its sales representatives in particular also suffices at this early stage. *See id.* at *6 ("Plaintiffs have stated the 'who': they contend that defendants misrepresented the safety and approved uses of [their drugs] in communications directed at plaintiffs and their physicians."); *cf. Mardini v. Viking Freight, Inc.*, 92 F. Supp. 2d 378, 387 (D.N.J. 1999) (holding that the allegation that "Defendants made material misrepresentations of . . . fact" gave "no indication of who made them," while noting the flexibility with which courts apply Rule 9(b) when information concerning alleged fraud is within the defendant's control).

The Chmils have therefore stated their intentional misrepresentation claim with particularity, giving Arthrex notice of the "who, what, where and when" of the fraud alleged against it. Arthrex's Motion to Dismiss will accordingly be denied as to the Chmils' claim for

intentional misrepresentation.[3]

**D.     Negligent Misrepresentation**

In the alternative, the Chmils allege that Arthrex and Dr. Meade should have known their statements were false. (Doc. 19 at ¶¶ 62-63). Given this allegation, and because the Chmils state a claim for intentional misrepresentation, they also state a claim for negligent misrepresentation. *See* Fed. R. Civ. P. 9(b) (conditions of mind "may be alleged generally"); *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) ("The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact [and the defendant should have known of its falsity.] Moreover, like any action in negligence, there must be an existence of a duty owed by one party to another."); *Weisblatt v. Minn. Mut. Life Ins. Co.*, 4 F. Supp. 2d 371, 380 & n.9 (E.D. Pa. 1998) (noting the difference between fraudulent and negligent misrepresentation is largely one of scienter); *Crosby by Crosby v. Sultz*, 592 A.2d 1337, 1346 (Pa. Super. Ct. 1991) (doctors owe a duty to their patients).

Arthrex's Motion to Dismiss will therefore also be denied as to the Chmils' negligent misrepresentation claim.

**E.     Punitive Damages**

Finally, Arthrex contends that the Chmils' purported cause of action for punitive damages must be dismissed or struck, because the complaint establishes Arthrex's negligence at most. (Doc. 23 at 34-37). The Chmils concede that there is no such thing as an "independent cause of action for punitive damages," but they point out they have alleged

---

[3]     Arthrex raises two new arguments in its reply brief: that the Chmils fail to allege causation, and that "allowing [the Chmils] to move forward with these types of allegations will open countless doctor-consultants to liability merely for aiding in the design and/or development of medical products designed to improve patient health." (Doc. 27 at 3-6). I will not consider these arguments raised for the first time in a reply brief, as the Chmils have not had an opportunity to respond to them. *D'Aiuto v. City of Jersey City*, No. CIVA 06-6222 JAG, 2007 WL 2306791, at *4 n.1 (D.N.J. Aug. 8, 2007) (Greenaway, J.).

11

more than just negligence. (Doc. 26 at 13-14).

"[O]rdinary negligence is not enough to warrant punitive damages." *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 772 (Pa. 2005). Just because a claim sounds in negligence, however, does not mean the plaintiff is foreclosed from "undertaking the additional burden of attempting to prove, as matter of damages, that the defendant's conduct not only was negligent but that the conduct was also outrageous, and warrants a response in the form of punitive damages." *Id.* Outrageous conduct is that which is willful, wanton, or reckless, or which demonstrates a defendant's "evil motive" or "reckless indifference to the rights of others." *Id.* at 770 (quotation omitted).

Whether couched in negligence or intentional tort, the Chmils' allegations are sufficient. According to the complaint, Arthrex recklessly disregarded the safety of patients like Lisa when it "continued to manufacture and market" a product it knew "was defective and unreasonably dangerous." (Doc. 19 at ¶ 70). This is precisely the sort of outrageous, recklessly indifferent conduct that would allow the Chmils to seek punitive damages. *See, e.g.*, *Neal v. Carey Canadian Mines, Ltd.*, 548 F. Supp. 357, 378 (E.D. Pa. 1982), *aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481 (3d Cir. 1985) (upholding award of punitive damages where "plaintiffs produced sufficient evidence to show that the [product] was defective in the absence of an adequate warning and that [the defendant]'s conduct in failing to affix such a warning amounted to a reckless indifference of the health and safety of plaintiffs in light of the knowledge held by its corporate officials").

Because the Chmils allege facts that would entitle them to seek punitive damages, Arthrex's Motion to Dismiss will be denied.

## IV. Conclusion

For the reasons stated above, Arthrex's Motion to Dismiss will be denied.

An appropriate order follows.

| | |
|---|---|
| February 27, 2019<br>Date | /s/ A. Richard Caputo<br>A. Richard Caputo<br>United States District Judge |